Edward J. HOLLAND, Jr.,
et al., Plaintiffs,

v.

FAHNESTOCK & CO., INC., a New York Corporation, David Pullman, Mazuma Capital, Inc., a California Corporation, and Tom Ghyczy, Defendants.

No. 01 CIV.2462(RMB)(AJP).

United States District Court,
S.D. New York..

Oct. 15, 2002.

Steven B. Caruso, Maddux, Koeller, Hargett & Caruso, New York City, Seth E. Lipner, Deutsh & Lipner, Garden City, NY, for plaintiffs.

David Pullman, Tom Glyczy, Stephen M. Kramarsky, David S. Pegno, Dewey, Pegno & Kramarsky, New York City, Steven Altman, Ziegler, Ziegler & Altman, LLP, New York City, for defendants.

## *ORDER*

BERMAN, District Judge.

### I. Background

On March 22, 2001, Plaintiffs Edward and Brian Holland and four (4) Delaware limited partnerships and corporations (collectively, "Plaintiffs") commenced an action against Defendants Fahnestock & Co, Inc. ("Fahnestock"), David Pullman ("Pullman"), Mazuma Capital, Inc. ("Mazuma"), and Tom Ghyczy ("Ghyczy") (collectively, "Defendants") for alleged violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), breach of contract, breach of fiduciary duty, and fraud and conversion, in connection with the structuring and sale of certain asset-backed securities.[1] On July 16, 2001, Plaintiffs filed an Amended Complaint ("Am. Compl."), which, among other things, dropped the Exchange Act claims, added a negligence claim against Defendant Fahnestock, deleted all references to Pullman LLC, which as a Delaware corporation was the sole non-diverse Defendant, and asserted federal diversity jurisdiction under 28 U.S.C. § 1332. On November 30, 2001, Defendants moved to dismiss the Amended Complaint, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P") 12(b)(7), for failure to join Pullman LLC as an "indispensable" party. If Defendants' motion were to prevail, the Court's diversity jurisdiction would be defeated, since Pullman LLC and some Plaintiffs are Delaware citizens. Am. Compl. ¶¶ 6–9.

On August 1, 2002, Magistrate Judge Andrew J. Peck, to whom the matter had been referred, issued a report and recommendation ("Report") recommending that Defendants' motion be denied. *See* Report at 28. ("Because Pullman LLC is no more than a co-obligor under the Engagement Letter and joint tortfeasor with defendant Fahnestock and Pullman, and because defendant Pullman adequately represents Pullman LLC's interests in this litigation, Pullman LLC is not an indispensable party to this action under Rule 19(b).") The Report also advises that "[p]ursuant to 28 U.S.C. § 636(b)(1) and Rules

---

1. Plaintiffs are songwriters, who retained Defendants Fahnestock and Pullman to structure securitization transactions ("Securitization Transactions") by issuing notes backed by the expected future stream of Plaintiffs' music royalties. Plaintiffs and Pullman signed an engagement letter ("Engagement Letter") which contains both an assignment clause providing, in pertinent part, that "David Pullman may at his sole discretion and without the consent of Owner cause Fahnestock to assign his rights and/or obligations under this Engagement Letter to David Pullman or any entity which employs David Pullman," Am. Compl. Ex. A., and a so-called Key Man clause providing, in pertinent part, that "David Pullman may at his sole discretion, assign the rights and/or obligations under this engagement

letter to David Pullman, or to any entity which employs David Pullman." Am. Compl. Ex. A.

The Securitization Transactions closed on June 2, 1998 and July 10, 1998, during which time Pullman served as Managing Director of Fahnestock's Structured Assets Sales Group. Pullman 11/29/01 Aff. ¶ 6. On July 22, 1998, Pullman formed Pullman LLC, a Delaware Limited Liability Corporation ("Pullman LLC"), to which Pullman and Fahnestock later assigned "all rights and obligations," under any "third party contracts" or "any contracts or understandings, oral or written, that David Pullman negotiated or entered into for and on behalf of the Structured Asset Sales Group" at Fahnestock. *Id.* ¶ 14–15, Exs. E & F.

72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections." *Id.* On August 16, 2002, Defendants submitted objections to the Report ("Objections"). Plaintiffs submitted a response to the Objections on August 26, 2002. ("Pl.Resp.").

**For the following reasons, the Court adopts the Report in all respects and denies Defendants' motion to dismiss.**

### II. Standard of Review

A district court evaluating a Magistrate's report may adopt those portions of the report to which no "specific, written objection" is made, as long as those sections are not clearly erroneous. Fed.R.Civ.P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Greene v. WCI Holdings Corp.,* 956 F.Supp. 509, 513 (S.D.N.Y.1997). "Where a party makes a 'specific written objection' within '[ten] days after being served with a copy of the [magistrate judge's] recommended disposition,' however, the district court is required to make a de novo determination regarding those parts of the report." *Cespedes v. Coughlin,* 956 F.Supp. 454, 463 (S.D.N.Y. 1997) (quoting *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the magistrate. *See DeLuca v. Lord,* 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); *Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y.1988).

### III. Analysis

The facts set forth in the Report are incorporated herein by reference. The unobjected-to portions of the Report are not clearly erroneous (and are supported by the law) and are adopted in full. *See Thomas,* 474 U.S. at 149, 106 S.Ct. 466.

■ The Court has conducted a *de novo* review of the objected-to portions of the Report, as well as the record, and applicable legal authorities. The Magistrate was correct in recommending that Defendants' motion be denied. *See, e.g., Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.,* 95 Civ. 8436, 2001 WL 585638 at *4 (S.D.N.Y. May 30, 2001) ("Well established precedent holds that 'one of several joint obligors is not an indispensable party to an action against the others'") (citing *Greenleaf v. Safeway Trails, Inc.,* 140 F.2d 889, 890 (2d Cir.1944)); *Jaser v. New York Prop. Ins. Underwriting Ass'n,* 815 F.2d 240, 242 (2d Cir.1987) ("[V]ery few cases should be terminated due to the absence of nondiverse parties unless there has been a reasoned determination that their nonjoinder makes just resolution of the action impossible."). And, as Magistrate Peck noted in the Report, Defendants can implead Pullman LLC as a third-party defendant (for purposes of contribution) without defeating the Court's diversity jurisdiction. *See* Fed.R.Civ.P. 14; Report at 25 ("Pullman LLC could ameliorate any prejudice by simply intervening or being impleaded by defendants—possibilities that defendants acknowledge but have not taken advantage of.")

Defendants' Objections are resolved as follows:

#### Pullman LLC Is A Co–Obligor

■ Defendants argue that by assigning "all rights and obligations" under the contract to Pullman LLC a "novation" occurred and Pullman LLC is, therefore, the sole obligor in this action. Defendants cite *Grupo Sistemas Integrales de Telecomunicacion de C.V. v. AT & T Communications, Inc.,* No. 92 Civ. 7862, 1996 WL 312535 at *4–*5 (S.D.N.Y. June 10, 1996) (Wood, J.) in support of this proposition.[2]

Defendants reliance upon *Grupo* is misplaced for two reasons. First, in *Grupo,* Judge Kimba M. Wood determined that the contract at issue was executory. *Grupo,* 1996 WL 312535 at *5 ("the obligation to perform under the contract belonged to [delegate AT & T] alone, because a novation of the contract occurred **while it was still executory.**") (emphasis added). Plaintiffs correctly distinguish *Grupo* by noting that, in

---

**2.** The Court in *Grupo* held that language in the contract which allowed defendant "to assign all of its rights, interests and obligations under such agreement to [a third party] ... clearly effected a novation." *Grupo,* 1996 WL 312535 at *4.

contrast here, "Pullman Group, LLC, did not become an entity until after the Hollands' securitization transactions closed." Pl. Resp. at 5.

Second, "[t]o establish a novation, there must be a clear and definite intention on the part of all the concerned parties that such is the purpose of the agreement." *Yahaya v. Hua,* No. 87 Civ. 7309, 1989 WL 214481 at *4 (S.D.N.Y. Nov.28, 1989). "[To discharge the duty of the delegating party], assent by the obligee to release the delegating party, in exchange for the new liability of the delegate, is required." III E. Allan Farnsworth, *Farnsworth on Contracts* § 11.11 (2d ed.1998). "Absent an express discharge of Fahnestock's obligations, the assignment provision can be interpreted as merely a consent to Fahnestock's delegation of duties." Report at 18; *see Lloyds Bank PlC v. Republic of Ecuador,* Nos. 96 Civ. 1789–90, 96 Civ. 1792–95, 96 Civ. 1797, 1998 WL 118170 at *10 (S.D.N.Y. Mar.16, 1998) ("The burden of proving a novation rests with the party asserting the defense.")

### Defendants Adequately Represent Pullman LLC's Interests

■ Defendants claim that Pullman and Pullman LLC have diverse interests, i.e., "even if Mr. Pullman was the sole stakeholder in Pullman LLC (which he is not) his interest would be the protection of the corporate form, whereas the LLC's interest would be to shield itself from liability." Objections at 7. Defendants' attempt to distinguish Pullman's interests from those of Pullman LLC is not persuasive. See *BMG Music v. Vanxy, Inc.,* 98 Civ. 6496, 1999 WL 493345 at *2 (S.D.N.Y. July 12, 1999) (finding that "Diaz, as Padosa's president and sole shareholder, would certainly be able to adequately represent Padosa, especially given that Diaz would provide Padosa's representation and that the interests of Diaz and Padosa are identical."); *Aetna Cas. & Sur. Co. v. Namrod Dev. Corp.,* 140 B.R. 56, 61–62 (S.D.N.Y. 1992) (corporation was "adequately represented" by defendants who were the corporation's "controlling shareholders, its President

and Vice President respectively and at least as of 1982, constituted its board of directors and owned all its stock.")

### Appropriate Forum

Defendants argue that Plaintiffs are engaged in "bad faith forum shopping," Objections at 6, presumably because Plaintiffs' counsel recently (on June 3, 2002) filed another action in New York State Supreme Court, on behalf of Lamont Dozier, who also "participated in the securitization transactions" at issue here. *Id.* at 2.[3]

Plaintiffs are not parties to the state case, and were entitled to elect to bring their case in federal court. "[C]ourts should give deference to a plaintiff's choice of forum. '[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Iragorri v. United Technologies Corp.,* 274 F.3d 65, 70–71 (2d Cir.2001) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)).

### Acts Committed After Formation of Pullman LLC

Defendants contend that "not all of the conduct complained of occurred before the formation of Pullman LLC." Objections at 2. But Magistrate Peck correctly determined that "plaintiff's core claim is for breach of the Engagement Letter [which presumably occurred before July 22, 1998 when the transactions closed], and that the remaining claims for fraud, conversion, and breach of fiduciary duty are intertwined with or derivative of the contract claim." Report at 10; Objections at 4. Since Defendants Fahnestock and Pullman are co-obligors under the contract, they may be liable on the contract claims and claims that are derivative of the contract. See *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 924 (2d Cir.1977) ("The act of delegation … does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable").

**3.** The state action, *Dozier et al. v. Fahnestock et al.,* Index No. 602049/02 was filed in N.Y. Supreme Court on June 3, 2002, and is brought against the same Defendants as in this action. Pl. Resp. at 1; Objections at 2.

*Impleader Is Available*

Denial of Defendants' motion poses no hardship or prejudice since Defendants can implead Pullman LLC as a third-party defendant, without defeating diversity. *See Niroomand v. Erie County Med. Ctr.*, No. 94 Civ. 0021, 1996 WL 328183 at *7 (W.D.N.Y. June 4, 1996) ("The defendants have not claimed that joinder of [absent party] by means of a third-party complaint is not feasible. Furthermore, there is no showing that any defendant ... is barred from bringing a subsequent claim for indemnity or contribution in another action; therefore there is apparent to this Court no prejudice to any party caused by the absence of [third party] in this action that will result from proceeding without it."); *see also* Fleming James, Jr. et al., *Civil Procedure* § 10.18 (5th ed.2001) ("the third-party defendant's being co-citizen of the plaintiff does not destroy the diversity established in the original action").

## IV. Conclusion

The Court incorporates the Report by reference and, for the reasons stated therein and herein, denies Defendants' motion to dismiss. Defendants have fifteen (15) days to implead Pullman LLC pursuant to Fed. R.Civ.P. 14. The parties are directed to appear with principals and/or full settlement authority at a scheduling/settlement conference with the Court on Friday, October 25, 2002, at 10:00 a.m., in Courtroom 706 of the United States District Courthouse, 40 Centre Street, New York, New York. **The parties are further directed to engage in good faith settlement negotiations prior to the conference.**

### *REPORT AND RECOMMENDATION*

PECK, United States Magistrate Judge.

Defendants have moved pursuant to Fed. R.Civ.P. 12(b)(7) to dismiss this action on the grounds that The Pullman Group, LLC ("Pullman LLC") is an indispensable party-defendant whose joinder is not feasible under Fed.R.Civ.P. 19, as joinder would defeat this Court's diversity jurisdiction. (Dkt.Nos.24–27.) For the reasons set forth below, defendants' motion should be DENIED.

## BACKGROUND

Plaintiffs Edward and Brian Holland are songwriters who wrote a number of Motown hit songs from the 1960s and 1970s, including "Stop in the Name of Love." (Dkt. No. 10: Am. Compl. ¶ 2; Dkt. No. 37: Defs. 56.1 Stmt. ¶ 1.) In 1997, plaintiffs entered into negotiations with defendant Fahnestock & Co., Inc. ("Fahnestock"), an investment bank, and defendant David Pullman, a Managing Director of Fahnestock, regarding the possibility of Fahnestock structuring securitization transactions (the "Securitization Transactions") for the issuance of notes secured by the expected future stream of plaintiffs' music royalties. (Am. Compl. ¶¶ 3, 11, 21, 23 & Ex. A; Defs. 56.1 Stmt. ¶¶ 2, 3, 17.) According to defendants, "David Pullman is the inventor of the Pullman Bond, a financial vehicle that permits an artist to realize, as a lump sum, the value of a stream of royalty revenues accruing over time ...." (Defs. 56.1 Stmt. ¶ 3.)

The parties' negotiations culminated in the execution on or about November 7, 1997, of an "Engagement Letter" between the Hollands and Fahnestock that provides, in pertinent part:

This engagement letter (the "Engagement Letter") confirms the engagement (the "Engagement") by Brian Holland and Edward Holland ("Owner") of Fahnestock & Co., Inc. ("Fahnestock") to act as Owner's agent and advisor on an exclusive basis with respect to the financial transactions described in paragraph 3(a) through (f) hereof ("Transactions") on the following terms and conditions:

1. *Engagement Period.* The term of the Engagement (the "Engagement Period") shall commence on the date Owner executes this letter (as entered by Owner below its authorized signatory's signature) (the "Commencement Date") and shall expire unless extended by mutual agreement of the parties hereto, upon the earlier of (a) the expiration of 180 days from the later of either the Commencement Date or the date Owner has delivered to Fahnestock the requested due diligence package information described in paragraph 3(g).

Upon expiration of the Engagement Period, all obligations of Fahnestock hereunder shall terminate, except as set forth in paragraph 5(c)(iii) hereof.

. . . .

7. *Breach*. . . . It is understood and agreed that the principal in charge of Fahnestock's Structured Asset–Sales Group and the active participant in the performance of Fahnestock's services and obligations hereunder are vital part of this Engagement letter. Upon the death or incapacitation of David Pullman, Managing Director, or David Pullman should cease to be actively engaged in Fahnestock Structured Asset Sales group and has not assigned this agreement, Owner shall have the right without liability of any kind whatsoever, by giving Fahnestock written notice thereof, to terminate the engagement pursuant to this Engagement Letter, as of the date of such notice.

. . . .

10. . . . .

(a) *Key Man Clause*. Not withstanding anything stated above, *David Pullman may at his sole discretion, assign the rights and/or obligations under this engagement letter to David Pullman, or to any entity which employs David Pullman.*

11. *Assignability*. Fahnestock may not assign its rights and/or obligations under this Engagement Letter without the consent of Owner, except to one or more affiliates of Fahnestock. Notwithstanding the foregoing, *David Pullman may at his sole discretion and without the consent of Owner cause Fahnestock to assign its rights and/or obligations under this Engagement Letter to David Pullman, or any entity which employs David Pullman*. . . .

12. *Law and venue.* This Engagement Letter shall be interpreted under and governed by the laws of the State of New York. In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the federal and state courts located in New York, New York, shall have full jurisdiction over both parties with regard [sic].

(Am. Compl. Ex. A, emphasis added.) The Engagement letter was signed by plaintiffs Brian and Edward Holland individually and by David Pullman as Managing Director of Fahnestock. (*Id.,* last page.)

Under Pullman's guidance, the Securitization Transactions that are at the heart of this lawsuit closed on June 2, 1998 and July 10, 1998, reaping millions of dollars for each of the plaintiffs. (Am. Compl. ¶¶ 3, 25–26; Dkt. No. 24: Pullman 11/29/01 Aff. ¶ 6.) Shortly thereafter, on July 22, 1998, David Pullman formed Pullman LLC, a Delaware limited liability corporation. (Pullman 11/29/01 Aff. ¶ 7 & Ex. B.)

Pullman claims that pursuant to the assignment provisions in the Engagement Letter, he "assigned and caused Fahnestock to assign all rights and obligations regarding Pullman Bond transactions (including the intellectual property relating to the Pullman Bond concept) to The Pullman Group in the late spring of 1998." (Pullman 11/29/01 Aff. ¶ 14.) "With respect to the particular transactions that were underway when The Pullman Group split off from Fahnestock (including the Hollands' transactions), the Assignment was confirmed by letter from Fahnestock on June 30, 1999 stating: 'This will affirm our understanding that all rights and obligations under any third-party contracts entered into by The Structured Asset Sales Group of Fahnestock & Co. when headed by David Pullman were transferred to David Pullman, individually, and the Pullman Group as of July 7, 1998.'" (Pullman 11/29/01 Aff. ¶ 15 & Ex. F.) On August 25, 2000, Fahnestock assigned to Pullman LLC, "[e]ffective as of August 19, 1998," all of Fahnestock's rights and "any and all related duties and obligations" in "any and all agreements, contracts or understandings, oral or written, which David Pullman negotiated or entered into for and on behalf of the Structured Asset Sales Group" of Fahnestock. (Pullman 11/29/01 Aff. Ex. E.)

On March 22, 2001, the Hollands commenced this action, alleging that defendants defrauded plaintiffs and breached the Engagement Letter in connection with the Securitized Transactions. (Dkt. No. 1: Compl.) The complaint alleged, *inter alia*, violations of Section 10(b) of the Securities Exchange

Act of 1934, breach of contract, breach of fiduciary duty, fraud, and conversion. (Compl.¶¶ 31–38, 53–72.) The complaint named as defendants, among others, Fahnestock, Pullman, and "The Pullman Group." (Compl.) The complaint alleged that David Pullman was "an employee, agent and managing director of Fahnestock's Structured Asset Sales Group, a division of Fahnestock, and renamed in January 1998 The Pullman Group.'" (Compl.¶ 6.) The complaint separately alleged "upon information and belief" that "The Pullman Group ... was an assumed name and unincorporated business of [David] Pullman .... Upon information and belief, Pullman Group, at times material hereto, was and is the successor and assignee of Fahnestock's Structured Asset Sales Group." (Compl.¶ 8.) The complaint alleged that The Pullman Group was involved, along with all of the other defendants, in certain of the actions leading up to and including the Securitization Transactions. (Compl.¶¶ 22, 26, 28(k), 28(n).) The complaint thus sought to hold The Pullman Group liable, along with each of the other defendants, for all stated claims, including breach of contract. (Compl.¶¶ 31–72.)

On July 16, 2001, the Hollands filed a First Amended Complaint which, among other things, dropped the federal securities law claim. (Dkt. No. 10: Am. Compl.)[1] Having thus lost federal question jurisdiction, 28 U.S.C. § 1331, plaintiffs deleted all references to The Pullman Group (the sole non-diverse defendant), and asserted federal diversity jurisdiction, 28 U.S.C. § 1332. (Am. Compl.) The Amended Complaint also added a claim against Fahnestock for negligent supervision of Pullman. (Am.Compl.¶¶ 65–72.) Other than those changes, the Amended Complaint substantially mimics the original Complaint, clarifying the key claim that, unbeknownst to plaintiffs, Fahnestock purchased some of the issued notes "at a substantial discount, and *simultaneously* 'sold' those notes to independent institutional buyers at face value reaping an undisclosed windfall in excess of $1,800,000." (Am. Compl.¶ 26(f), emphasis in original.) Thus, the amended complaint alleges that Fahnes-

tock and Pullman improperly skimmed both a higher than standard 10% commission and a $1.8 million windfall on the sale of discounted notes. (Am.Compl.¶¶ 24(f), 26(e)-(f).) The Amended Complaint also alleges liability on the core breach of fiduciary duty, fraud, and breach of contract claims against only Fahnestock and Pullman, rather than against all defendants. (Am.Compl.¶¶ 27–52.)

On November 30, 2001, defendants moved to dismiss on Rule 12(b)(7) grounds for failure to join Pullman LLC, an allegedly indispensable party. (Dkt.Nos.24–25.) After discovery concluded, defendants moved for summary judgment. (Dkt.Nos.34–38, 42–44.) Before the summary judgment motion was fully briefed, Judge Berman in May 2002 denied the summary judgment motion without prejudice as premature, and referred to me for a report and recommendation defendants' Rule 12(b)(7) motion to dismiss. (Dkt.Nos.40–41.)

## *ANALYSIS*

### I. *APPLICABLE LAW GOVERNING A MOTION TO DISMISS UNDER RULE 12(b)(7) AND RULE 19*

"Fed.R.Civ.P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party belongs in the suit, *i.e.,* whether the party qualifies as a 'necessary' party under Rule 19(a)." *Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 724 (2d Cir.), *cert. denied,* 531 U.S. 1051, 121 S.Ct. 655, 148 L.Ed.2d 558 (2000). Rule 19(a) defines the parties who are "necessary" (a term no longer used in the Rule) in the sense that their joinder is compulsory "if feasible":

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person

---

1. On March 5, 2002, Judge Berman granted the parties' stipulation dismissing without prejudice

plaintiffs' state law securities claims. (Dkt. No. 30.)

claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

Fed.R.Civ.P. 19(a). "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d at 724 (citing *Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1123 (2d Cir.1990)); *see also, e.g., Temple v. Synthes Corp.*, 498 U.S. 5, 8, 111 S.Ct. 315, 316, 112 L.Ed.2d 263 (1990); *Rose v. Simms*, 95 Civ. 1466, 1995 WL 702307 at *3 (S.D.N.Y. Nov.29, 1995); 7 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 3d* § 1607 at 84 (3d ed.2001).

"But where the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons, ... the court must finally determine whether the party is 'indispensable.'" *Viacom Int'l, Inc. v. Kearney*, 212 F.3d at 725. Rule 19(b) provides:

(b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b). The Supreme Court has summarized Rule 19(b)'s four factors as follows: (1) whether the party sought to be joined has an interest in having a forum and whether an adequate alternate forum exists; (2) the interest of the party seeking joinder in avoiding "multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another;" (3) "the interest of the outsider whom it would have been desirable to join;" (4) "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109–11, 88 S.Ct. 733, 737–39, 19 L.Ed.2d 936 (1968); *see generally* 7 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 3d* § 1608.

Rule 19(b) does not "assign relative weight to each of the factors enumerated in this Rule," but instead contemplates that the Court will "determine the emphasis to be placed on each consideration according to 'the facts of [the] given case and in light of the governing equity-and-good-conscience test.'" *Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d at 1124. "The language of Rule 19(b) leaves the district court with 'substantial discretion in considering which factors to weigh and how heavily to emphasize certain considerations in deciding whether the action should go forward in the absence of someone needed for a complete adjudication of the dispute.'" *Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 75 (2d Cir.1984); *accord, e.g., Rose v. Simms*, 1995 WL 702307 at *3. "The phrase 'good conscience' implies a careful and constructive consideration of those parties that are necessary to the litigation. As a consequence, very few cases should be terminated due to the absence of nondiverse parties unless

there has been a reasoned determination that their nonjoinder makes just resolution of the action impossible." *Jaser v. New York Prop. Ins. Underwriting Ass'n,* 815 F.2d 240, 242 (2d Cir.1987).[2]

■ The moving party "has the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence." *Citizen Band Potawatomi Indian Tribe v. Collier,* 17 F.3d 1292, 1293 (10th Cir.1994); *accord, e.g., West Peninsular Title Co. v. Palm Beach County,* 41 F.3d 1490, 1492 (11th Cir.), *cert. denied,* 516 U.S. 932, 116 S.Ct. 338, 133 L.Ed.2d 237 (1995); *Ashley v. American Airlines, Inc.,* 738 F.Supp. 783, 788 (S.D.N.Y.1990); 7 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 3d* § 1609 at 129–30; 2 *Moore's Federal Practice* ¶ 12.35 at 12–86.2 (3d ed.2002).

■ The Court may consider matters outside the pleadings in ruling on the motion. *See, e.g., Citizen Band Potawatomi Indian Tribe v. Collier,* 17 F.3d at 1293; *Albahary v. City of Bristol,* 963 F.Supp. 150, 156 n. 2 (D.Conn.1997); *Continental Kraft Corp. v. Euro–Asia Dev. Group, Inc.,* No. 97 CV. 0619, 1997 WL 642350 at *6 (E.D.N.Y. Sept. 8, 1997); *Circle Indus. v. City Fed. Sav. Bank,* 749 F.Supp. 447, 457 n. 2 (E.D.N.Y. 1990), *aff'd,* 931 F.2d 7 (2d Cir.1991); 5A C. Wright & A. Miller, *Federal Practice & Procedure: Civil 2d* § 1359 at 427 & n. 12 (collecting cases). In deciding this motion, the Court has considered affidavits submitted by the parties in connection with both this

motion to dismiss and the subsequent summary judgment motion.

"The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (quoting *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989)); *see also, e.g., American Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.").

## II. APPLICATION OF RULE 12(b)(7) AND RULE 19 TO THE PRESENT CASE

Defendants argue, and plaintiffs do not appear to dispute, that plaintiffs' core claim is for breach of the Engagement Letter, and that the remaining claims for fraud, conversion, and breach of fiduciary duty are intertwined with or derivative of the contract claim.[3] (Dkt. No. 25: Defs. Br. at 10–11, 13.) Defendants further assert that Pullman LLC is the sole obligor under the Engagement Letter, and thus the real party in interest to the contract dispute. (*Id.* at 7, 9.) It is undisputed that Pullman LLC and certain plaintiffs are Delaware citizens, so that diversity jurisdiction under 28 U.S.C. § 1132 would be destroyed if Pullman LLC were joined as a defendant.[4] (Defs. Br. at 8 n. 3.) Defendants assert that the action must be dismissed under Rule 12(b)(7) for failure to

2. *Accord, e.g., Rose v. Simms,* 1995 WL 702307 at *3; *Ing. Hoschek Autoverleich GES.M.B.H. v. Balag, Ltd.,* 93 Civ. 8513, 1994 WL 701989 at *3 (S.D.N.Y. Dec.14, 1994) ("few cases should be terminated due to the absence of non-diverse parties unless such non-joinder greatly impacts the likelihood of just resolution of the action"); 7 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 3d* § 1609 at 130 ("Federal courts are extremely reluctant to grant motions to dismiss based on nonjoinder and, in general, dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result.").

3. Defendants emphasize the contract rather than the tort claims for the obvious reason that joint

tortfeasors are not necessary, much less indispensable, parties. *See, e.g., Temple v. Synthes Corp.,* 498 U.S. 5, 7, 111 S.Ct. 315, 316, 112 L.Ed.2d 263 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."); *Samaha v. Presbyterian Hosp.,* 757 F.2d 529, 531 (2d Cir.1985) ("it is settled federal law that joint tortfeasors are not indispensable parties"); 4 *Moore's Federal Practice* § 19.06[2].

4. The plaintiffs to this action include Edward and Brian Holland along with four Delaware limited partnerships and corporations formed for the purpose of effectuating the Securitization Transactions. (Dkt. No. 10: Am. Compl. ¶¶ 6–9, 25(b).)

join Pullman LLC as an indispensable party under Rule 19(b).

## A. Pullman LLC is Jointly Liable with Fahnestock and the Pullman Group

A threshold question is whether, and on what grounds, Pullman LLC could be held liable for breach of the Engagement Letter. The Amended Complaint alleges, and defendants appear to agree, that the allegedly wrongful acts in question were committed from 1997 through no later than approximately July 10, 1998, the date of the second Securitization Transaction. (Dkt. No. 10: Am. Compl. ¶¶ 23–26; Dkt. No. 37: Defs. 56.1 Stmt. ¶¶ 21–25, 28, 32; Dkt. No. 42: Pl. 56.1 Stmt. ¶¶ 4–9, 33, 42–44, 65–70.)[5] Pullman LLC was formed on July 22, 1998. (Dkt. No. 24: Pullman 11/29/01 Aff. ¶ 7 & Ex. B.) Plaintiffs therefore argue that Pullman LLC is neither necessary nor indispensable to this action, as the wrongful acts predated Pullman LLC's formation. (Dkt. No. 26: Pl. Br. at 2, 5–6.) Defendants, by contrast, assert that Pullman LLC is solely responsible for the alleged breach of the Engagement Letter because: (1) acts allegedly breaching the Engagement Letter were committed by "The Pullman Group," an unincorporated business that was independent of Fahnestock and predecessor in interest to Pullman LLC; and (2) Fahnestock assigned to The Pullman Group and later to Pullman LLC all of Fahnestock's rights and obligations relating to the Engagement Letter. (Dkt. No. 25: Defs. Br. at 4–7.)

As explained below, contrary to defendants' assertions, Pullman LLC appears to be a joint obligor with Fahnestock and The Pullman Group under the Engagement Letter.

Fahnestock and plaintiffs Edward and Brian Holland were the only parties to the November 1997 Engagement Letter. (Am. Compl.Ex. A.) Fahnestock's Structured Assets Sales Group—run by Pullman—was initially in charge of the Securitization Transactions. (Id. ¶ 7.) Pullman submitted an affidavit on this motion averring that his "group" at Fahnestock was "initially called the Structured Assets Group and later called simply The Pullman Group." (Dkt. No. 24: Pullman 11/29/01 Aff. ¶ 5.) He concedes that "[d]uring 1997 and the early part of 1998, [his] group was a division of Fahnestock." (Id.)

Pullman avers, however, that subsequently his "group was spun off from Fahnestock, renamed the 'Pullman Group' and began operating entirely independently of Fahnestock." (Id.) While The Pullman Group "continued to occupy office space owned by Fahnestock at that time, [The Pullman Group] had [its] own stationery, business cards and other resources indicating [its] independent status." (Id.) Pullman claims that "[i]t was this independent entity (then an unincorporated sole proprietorship) that crafted the Pullman Bond transactions on behalf of plaintiffs Edward and Brian Holland in early 1998[6] and closed those transactions on June 2, 1998 and July 10, 1998 respectively." (Id. ¶ 6.) In support of this latter assertion, Pullman offers only a copy of a letter dated July 6, 1998 on stationery titled "The PULLMAN Group."[7] (Dkt. No. 24: Pullman 11/29/01 Aff. Ex. A.)

---

5. Under the conversion claim, defendants are alleged to have withheld converted funds continuously from the date of conversion through the filing of the Complaint. (Am.Compl.¶ 56.) However, the predicate wrongful taking occurred at the same time as the other wrongful acts. (Am. Compl.¶¶ 54–56.)

6. Pullman's chronology is somewhat confused, as he states that "in the late spring of 1998," The Pullman Group "was spun off ... and began operating entirely independently of Fahnestock" (Pullman 11/29/01 Aff. ¶ 5), while in the next paragraph of his affidavit he states that "this independent entity"—i.e., The Pullman Group—crafted the Securitization Transactions "in early 1998" (id. ¶ 6).

7. As further support, defendants cite to the original Complaint, in which plaintiffs alleged upon information and belief that "Fahnestock's Structured Asset Sales Group, a division of Fahnestock, [was] renamed in January 1998 'The Pullman Group'" (Dkt. No. 1: Compl. ¶ 6), that "The Pullman Group ... was an assumed name and unincorporated business of [David] Pullman" (Compl.¶ 8), and that the Pullman Group was liable for breach of the Engagement Letter and related torts (Compl.¶¶ 22, 26, 28(k), 28(n), 31–72). Defendants ignore well-settled precedent that superseded pleadings, while admissible in evidence, do not constitute judicial admissions. See, e.g., Tho Dinh Tran v. Alphonse Hotel Corp., 281 F.3d 23, 32 (2d Cir.2002) ("A statement in a withdrawn complaint that is superseded by an

Pullman also claims that pursuant to the assignment provisions in the Engagement Letter, he "assigned and caused Fahnestock to assign all rights and obligations regarding Pullman Bond transactions (including the intellectual property relating to the Pullman Bond concept) to The Pullman Group in the late spring of 1998." (Pullman 11/29/01 Aff. ¶ 14.) Defendants offer no support for this (apparently oral) assignment other than Mr. Pullman's affidavit. "With respect to the particular transactions that were underway when The Pullman Group split off from Fahnestock (including the Hollands' transactions), the Assignment was confirmed by letter from Fahnestock on June 30, 1999 stating: 'This will affirm our understanding that all rights and obligations under any third-party contracts entered into by The Structured Asset Sales Group of Fahnestock & Co. when headed by David Pullman were transferred to David Pullman, individually, and the Pullman Group as of July 7, 1998.'" (Pullman 11/29/01 Aff. ¶ 15 & Ex. F.) The July 7, 1998 effective date of this written assignment fell between the dates of the two Securitization Transactions.

On July 22, 1998, Pullman formed Pullman LLC, which "was the successor to all rights and obligations of the unincorporated Pullman Group and was chargeable with all acts performed by that proprietorship." (Pullman 11/29/01 Aff. ¶¶ 7, 8 & Ex. B.) Years later, on August 25, 2000, Fahnestock "formalized" its "late spring" 1998 assignment by assigning in writing to Pullman LLC, "effective as of August 19, 1998," all of Fahnestock's rights and "any and all related duties and obligations" in "any and all agreements, contracts or understandings, oral or written, which David Pullman negotiated or entered into for and on behalf of the Structured Asset Sales Group" of Fahnestock.[8] (Pullman 11/29/01 Aff. ¶ 14 & Ex. E.)

Although defendants' version of events and theory of liability are not models of clarity, they boil down to the following. All of the challenged acts took place from the beginning of 1998 through July 1998 and were committed by The Pullman Group, an unincorporated sole proprietorship independent of Fahnestock. Some time prior to the completion of the Securitization Transactions, Fahnestock assigned to The Pullman Group all of its rights and obligations relating to the Engagement Letter. When Pullman LLC was formed on July 22, 1998, it succeeded to all of The Pullman Group's rights and obligations, including those relating to the Engagement Letter. Ultimately, Fahnestock formally assigned to Pullman LLC as of August 19, 1998 all of Fahnestock's rights and obligations relating to, *inter alia*, the Engagement Letter. According to defendants, Pullman LLC thus absorbed all liability for alleged breach of the Engagement Letter, either as successor in interest to The Pullman Group or by direct assignment from Fahnestock: "The Pullman Group, first in its unincorporated form and later as an LLC is the owner and creator of all of the rights and obligations at issue in this case. The acts that plaintiffs complain of ... were acts of The Pullman Group taken pursuant to the Engagement Letter prior to its incorporation a few weeks later." (Pullman 11/29/01 Aff. ¶ 17; *see* Defs. Br. at 7.)[9]

Defendants' theory of liability is fundamentally flawed. Even if one accepted that The Pullman Group committed the acts at

---

amended complaint without the statement is no longer a conclusive judicial admission."). If The Pullman Group rather than Fahnestock did, in fact, conduct the Securitization Transactions, presumably defendants could have submitted proof in the form of transactional documents, wire transfers, etc.

8. Again, Pullman's chronology is confused, as he claims that the (apparently oral) assignment took place in "late spring" (Pullman 11/29/01 Aff. ¶ 14), whereas the two written assignments "confirming" or "formalizing" the oral assignment were effective as of July 7, 1998 and August 19, 1998 (*id.* ¶¶ 14–15)—after spring had ended.

Pullman also references a separate written assignment dated (as opposed to effective) August 19, 1998, that appears to have nothing to do with the contract at issue here. (*Id.* ¶ 14 & Ex. E.)

9. Naturally, the parties reversed positions in their summary judgment papers: defendants asserted that the corporate veil protects all but Fahnestock from liability for breach of contract (Dkt. No. 38: Defs. Sum. J. Br. at 8–9), and *plaintiffs* asserted (without evidentiary support of any kind) that "Pullman's association with Fahnestock was a facade" (Dkt. No. 42: Pl. 56.1 Stmt. ¶ 70).

issue, that Pullman LLC succeeded to The Pullman Group's liabilities, and that Fahnestock's various assignments were all valid, there is still no basis to conclude that Fahnestock or The Pullman Group were discharged from liability simply because Pullman LLC succeeded to liability. Rather, Fahnestock, The Pullman Group, and Pullman LLC remain joint obligors under the Engagement Letter, for two reasons.

### 1. Since There Was No Novation Releasing Fahnestock, Fahnestock and Pullman LLC Would Be Jointly Liable to Plaintiffs

First, while the Engagement Letter provided that Fahnestock could delegate its obligations to Pullman, plaintiffs never released Fahnestock from liability under the Engagement Letter. Accordingly, even if Fahnestock properly assigned its rights and delegated its obligations under the Engagement Letter to The Pullman Group and Pullman LLC, Fahnestock nevertheless remains a co-obligor with The Pullman Group and Pullman LLC under the Engagement Letter because Fahnestock was never released from liability.

The Second Circuit has explained:

> It is true, of course, as a general rule, that when rights are assigned, the assignor's interest in the rights assigned comes to an end. When duties are delegated, however, the delegant's obligation does not end.
>
> . . . .
>
> The act of delegation . . . does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable.

*Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir.1977).[10]

"Delegation . . . does not free the obligor-delegant from his duty to see to it that performance is rendered, *unless there is a novation.*" J. Calamari & J. Perillo, *The*

*Law of Contracts* § 18–25 (fns. omitted, emphasis added); *accord, e.g.,* 4 *Corbin on Contracts* § 866 at 456 (Party having duty can only get rid of it by being discharged. One method "is called 'novation,' by which, with the obligee's assent, a substitution of debtors is effected.") (fns.omitted).

Under New York law, a novation requires four elements: "(1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract." *Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 82–83 (2d Cir.1996) (quotations omitted); *accord, e.g., Citibank, N.A. v. Benedict*, 97 Civ. 9541, 2000 WL 322785 at *8 (S.D.N.Y. Mar.28, 2000) (" 'New York courts have set a stringent standard for novation.' ").

The key element of a novation is that the parties unequivocally intended to extinguish and discharge the prior obligation. *See, e.g., Citibank, N.A. v. Benedict*, 2000 WL 322785 at *8–9 (factual dispute as to whether parties expressly agreed that prior obligor would be released precludes summary judgment); *Koenig Iron Works, Inc. v. Sterling Factories, Inc.*, 89 Civ. 4257, 1999 WL 178785 at * 8 (S.D.N.Y. Mar.30, 1999) ("This is not a case in which there can be a presumption that the parties intended to create a new, or substitute agreement, by their executing formalized papers with unequivocal language . . . . The documents do not contain language which even suggests that the obligations under the original contract were being extinguished; nor is there any reference to a release."); *Wang v. Chen*, 89 Civ. 8319, 1992 WL 7840 at *6 (S.D.N.Y. Jan.10, 1992) (" 'a novation must never be presumed' "); *Yahaya v. Hua*, 87 Civ. 7309, 1989 WL 214481 at *4 (S.D.N.Y. Nov.28, 1989) ("To establish a novation, there must be a clear and definite intention on the part of all the concerned parties that such is the purpose of the agreement.").[11]

10. *Accord, e.g., Davidson v. Madison Corp.*, 257 N.Y. 120, 125, 177 N.E. 393, 394 (1931); J. Calamari & J. Perillo, *The Law of Contracts* § 18–25 (3d ed. 1987) ("When a right is assigned, the assignor ordinarily no longer has any interest in the claim. When a duty is delegated,

however, the delegating party (delegant) continues to remain liable.") (fn.omitted); III *Farnsworth on Contracts* § 11.10 at 125–26 (2d ed.1998).

11. *See also, e.g., Kaloidis v. Petrakis*, 274 A.D.2d 502, 502, 711 N.Y.S.2d 471, 472 (2d Dep't 2000)

In this case, the Engagement Letter provided that Pullman may "cause Fahnestock to assign its rights and/or obligations" to Pullman (or any entity employing him) "without the consent of [plaintiffs]." (Am. Compl. Ex. A: Engagement Letter ¶ 11; *accord*, ¶ 10(a); both quoted at page 492 above.) [12] Absent an express discharge of Fahnestock's obligations, the assignment provision can be interpreted as merely a consent to Fahnestock's delegation of duties. *E.g., Wang v. Chen*, 1992 WL 7840 at *6 ("Although the third party defendants dealt with the Wangs, this behavior ... is also consistent with an acceptance of Chen's delegation of his duties under the contract, and does not indicate that they intended to discharge Chen from responsibility."); III *Farnsworth on Contracts* § 11.11a at 140–41 ("It is important that the consent be more than mere consent *to the delegation;* it must be consent *to the discharge* of the delegating party.").[13] This Court finds that defendants have failed to satisfy their burden of proving the existence of a novation. *See Lloyds Bank PlC v. Republic of Ecuador*, 96 Civ. 1789–90, 96 Civ. 1792–95, 96 Civ. 1797, 1998 WL 118170 at *10 (S.D.N.Y. Mar.16, 1998) ("The burden of proving a novation rests with the party asserting the defense.").

Absent a novation, Fahnestock remained liable jointly with any assignees under the Engagement Letter. 4 *Corbin on Contracts* § 866 at 453 ("The assumption of the assignor's duty by the assignee merely gives to the other party a new and added security.").

Although the parties have entirely ignored the issue, treatises explain that a delegator that has not been discharged of its duties is in the position of a surety, with the delegate assuming the position of primary obligor:

> But though the delegate's assumption makes the delegate liable to the obligee, it does not discharge the duty to the obligee of the delegating party; and if the delegating party repudiates its duty, it is liable to the obligee. Thus, as a result of the assumption, the delegate and the delegating party are now both under a duty to the obligee to render the same performance. But the obligee is entitled to only one performance, and, as between the delegate and the delegating party, it is the delegate that should render the performance because the delegate promised to do so by its assumption. The relationship is thus one of suretyship, in which the delegate is the principal and the delegating party is the

("The appellant contends that as a result of the letter guarantees executed by [defendant], his obligations as guarantor of the notes were discharged. This claim has no merit as there is no evidence of 'an unequivocal intention' to extinguish the appellant's prior obligation and to replace it with the new obligation personally assumed by [defendant]."); *Meyersohn v. Bloom*, 259 A.D.2d 432, 433, 687 N.Y.S.2d 341, 342 (1st Dep't 1999) ("The letters, even coupled with the subsequent conduct of the parties, did not demonstrate an unequivocal intention to extinguish the prior obligation ... and to replace it with the new obligation personally assumed by defendant. Since the requisite element of a discharge of a prior debt was not satisfied ..., the court erred in granting summary judgment to plaintiffs."); *Auerbach v. State Tax Comm'n*, 142 A.D.2d 390, 394, 536 N.Y.S.2d 557, 560 (3d Dep't 1988) ("A party to a contract is not relieved of his obligations by a simple assignment of the contract; the assignment must specifically provide for a release from liability upon assignment."); III *Farnsworth on Contracts* § 11.11 at 139–40 ("Although neither an effective delegation by a delegating party nor an assumption by a delegate results in the discharge of the duty of the delegating party, a discharge may result if the obligee consents to it. The transaction usually takes the

form of a novation.... However, more is required for a novation than the mere consent of the obligee to performance by the delegate. Such consent may suffice to preclude the obligee from claiming that performance is not delegable, but it is not enough to discharge the duty of the delegating party. For that, assent by the obligee to release the delegating party, in exchange for the new liability of the delegate, is required.") (fns.omitted).

12. Because the Engagement Letter was akin to a personal services contract, the plaintiffs' consent would be required before the obligor (Fahnestock) could even *delegate* its duties, much less discharge its obligations. *See, e.g., Preferred Oncology Networks of Am., Inc. v. Bottino*, 96 Civ. 1898, 1997 WL 305253 at *2 (S.D.N.Y. May 28, 1997) (Parker, D.J.) (under New York law, personal services contracts are not assignable without the obligee's consent; collecting cases).

13. *But see Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT & T Communications, Inc.*, 92 Civ. 7862, 1996 WL 312535 at * 4–5 (S.D.N.Y. June 10, 1996) (finding that nearly identical language to that in this case "clearly effects a novation").

surety, and all of the consequences of a suretyship relationship follow.

III *Farnsworth on Contracts* § 11.11 at 135–36 (fns.omitted); *see generally* 3 *Williston on Contracts* §§ 418, 420 (3d ed.1960).

Under surety law, Pullman LLC is not a necessary party, since Fahnestock can be sued alone: "If the action is to obtain a money judgment against the surety alone, the creditor cannot be compelled to bring in the principal as a defendant, unless the suretyship contract expressly provides as a condition precedent to liability on the part of the surety that the principal must be made a party to any action on the undertaking." 63 *N.Y. Jur.2d* Guaranty & Suretyship § 335 (fns.omitted); *see also, e.g., Huber Lathing Corp. v. Aetna Cas. & Sur. Co.,* 132 A.D.2d 597, 598, 517 N.Y.S.2d 758, 760 (2d Dep't 1987) ("it is not unusual for the beneficiary of a guarantee to sue a guarantor or surety alone, apart from any action against the principal debtor . . ., and there is no requirement that the beneficiary join both parties"). Especially where, as here, the surety (Fahnestock) was originally the primary obligor under the agreement, it would defy equity to require plaintiffs to first sue the now-primary obligor (presumably, Pullman LLC) as a condition precedent to suing the original obligor (Fahnestock).

### 2. The Pullman Group Was Not Discharged From Liability When Pullman *LLC* Was Formed

The second ground for finding Pullman LLC jointly liable with other defendants is that The Pullman Group was not discharged of its liabilities when Pullman LLC succeeded to those liabilities. " '[W]here a sole proprietorship converts to a limited liability company, . . . the sole proprietor retains personal liability for all preconversion debts and obligations incurred by the sole proprietorship.' " *Baker v. Dorfman,* 99 Civ. 9385, 2000 WL 1010285 at *5–6 (S.D.N.Y. July 21, 2000), *aff'd,* 232 F.3d 121 (2d Cir.2000); *see also, e.g., Acetate Box Corp. v. Johnsen,* 193 Misc. 54, 80 N.Y.S.2d 134 (Sup.Ct. Kings Co.1948).

Pullman has sworn that The Pullman Group, an "independent entity (then an *unin-corporated sole proprietorship*) . . . crafted the Pullman Bond transactions on behalf of plaintiffs Edward and Brian Holland in early 1998 and closed those transactions on June 2, 1998 and July 10, 1998 respectively." (Dkt. No. 24: Pullman 11/29/01 Aff. ¶ 6, emphasis added.) Even assuming that Fahnestock assigned its obligations under the Engagement Letter to The Pullman Group, there is no evidence that plaintiffs discharged The Pullman Group for acts committed in 1998. Accordingly, to the extent defendants claim that Fahnestock assigned to The Pullman Group its obligations under the Engagement Letter, and to the extent The Pullman Group committed the breaches relating to the Securitization Transactions, The Pullman Group remains liable for those acts despite Pullman LLC's succession. Moreover, as the "sole proprietor" of The Pullman Group, David Pullman remains individually liable for The Pullman Group's acts. *See, e.g., Latham Sparrowbush Assoc. v. Shaker Estates, Inc.,* 153 A.D.2d 788, 791, 545 N.Y.S.2d 219, 222 (3d Dep't 1989); *Anti–Hydro Co. v. Castiglia,* 92 A.D.2d 741, 742, 461 N.Y.S.2d 87, 88 (4th Dep't 1983) ("a sole proprietor is personally liable for his business debts").

In sum, while Pullman LLC may have succeeded to liability based on assignment or as successor in interest, the parties originally liable to plaintiffs have not been discharged and thus remain liable. Fahnestock, The Pullman Group, and Pullman LLC could therefore be jointly and severally liable for any breach of the Engagement Letter, and may be sued accordingly. *See Taylor Woodrow plc v. Blitman,* 603 F.Supp. 1152, 1156 (S.D.N.Y.1985) ("[I]t is the law of New York that an obligee may proceed against either joint obligor and that a judgment against one shall not discharge the other."); N.Y. Gen. Oblig. Law § 15–102 (McKinney's 2002) ("A judgment against one or more of several obligors, or against one or more of joint, or of joint and several obligors shall not discharge a co-obligor who was not a party to the proceeding wherein the judgment was rendered."). Of these three obligors, Fahnestock and The Pullman Group (in the person of David Pullman) are already named

defendants, leaving only Pullman LLC as an absent party.

## B. A Co–Obligor Is Not An "Indispensable" Party Under Rule 19

The finding that Fahnestock, The Pullman Group, and Pullman LLC are co-obligors under the Engagement Letter entirely undermines defendants' argument that Pullman LLC is an indispensable party.

At the core of defendants' Rule 19 argument is their assertion (Dkt. No. 25: Defs. Br. at 10) that parties to a contract are generally considered "necessary" parties under Rule 19(a).[14] Defendants (and plaintiffs) ignore, however, the equally well-settled doctrine that *co-obligors* to an agreement are not "indispensable" parties to a litigation under Rule 19(b). *See, e.g., Newman–Greene, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 838, 109 S.Ct. 2218, 2226, 104 L.Ed.2d 893 (1989) ("given that all of the guarantors ... are jointly and severally liable, it cannot be argued that [absent guarantor] was indispensable to the suit"); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 408–09 (3d Cir.1993) (absent party that was sole signatory to agreement held not necessary to action, because absent party and named defendant were joint obligors, as distinguished from joint obligees); *Tehran–Berkeley Civil & Envtl. Eng'r v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 243 (2d Cir.1989) ("We have construed Fed. R.Civ.P. 19 as not mandating the joinder of joint obligors."); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.,* 844 F.2d 1050, 1054 (3d Cir.1988) (co-obligor is necessary but not indispensable); *Brackin Tie, Lumber & Chip Co. v. McLarty Farms, Inc.,* 704 F.2d 585, 586–87 (11th Cir.1983) (following majority view that co-obligors, unlike co-obligees, are not indispensable parties); *Greenleaf v. Safeway Trails, Inc.,* 140 F.2d 889, 890–91 (2d Cir.) ("one of several joint obligors is not an indispensable party to an action against the others"), *cert. denied,* 322 U.S. 736, 64 S.Ct. 1048, 88 L.Ed. 1569 (1944).[15]

As the Second Circuit explained long ago:

"[T]he plaintiff, by his judgment against one of his joint debtors, gets the relief he is entitled to, and no injustice is done to that debtor, because he is only made to perform an obligation which he was legally bound to perform before. The absent joint obligors are not injured, because their rights are in no sense affected, and they remain liable to contribution to their coobligor who may pay the judgment by suit, as they would have been had he paid it without suit." And this is especially true under New York statutes which permit a joint obligor to be sued separately.

---

**14.** *See, e.g., Ryan v. Volpone Stamp Co.,* 107 F.Supp.2d 369, 387 (S.D.N.Y.2000) ("It is well-established that a party to a contract which is the subject of the litigation is considered a necessary party."); *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.,* 960 F.Supp. 701, 707–08 (S.D.N.Y.1997) (Sotomayor, D.J.) ("As a direct party to the contract which is under dispute, Karabu is a necessary party to this litigation for at least three reasons articulated under" Fed. R.Civ.P. 19(a).); *Kawahara Enter., Inc. v. Mitsubishi Elec. Corp.,* 96 Civ. 9631, 1997 WL 589011 at *3 (S.D.N.Y. Sept.22, 1997) (parties to contract were necessary parties to breach of contract action); *Ragan Henry Broad. Group, Inc. v. Hughes,* No. 91–CV–6157, 1992 WL 151308 at *2 (E.D.Pa. June 19, 1992) ("Generally, where rights sued upon arise from a contract, all parties thereto must be joined.").

**15.** *See also, e.g., General Elec. Capital Corp. v. Por–Fac Cooperative, Inc.,* 01 Civ. 10215, 2002 WL 1300054 at *3 (S.D.N.Y. June 11, 2002) ("Even if Defendants were viewed as co-obligors on the lease, joinder would not be required under Rule 19 ...."); *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.,* 95 Civ. 8436, 2001 WL 585638 at *4 (S.D.N.Y. May 30, 2001) ("Well established precedent holds that 'one of several joint obligors is not an indispensable party to an action against the others.'") (citation omitted); *Rose v. Simms,* 95 Civ. 1466, 1995 WL 702307 at *6 (S.D.N.Y. Nov.29,1995) ("While co-obligors are treated as necessary under Rule 19(a), they are generally not indispensable under Rule 19(b)."); *Cunard Line Ltd. v. Abney,* 540 F.Supp. 657, 659 n. 3 (S.D.N.Y.1982) ("The individual joint obligor is a necessary party (not an indispensable one) in an action against one or more of the joint individual obligors ..."); 4 *Moore's Federal Practice* § 19.06[3] (3d ed.2002) ("even if co-obligors are determined to be necessary parties whose joinder is not feasible, they are generally not held to be indispensable"); 7 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 3d* § 1613 at 177–78 ("Joint obligors ... typically are treated as Rule 19(a) parties, but are not deemed indispensable under Rule 19(b).").

*Greenleaf v. Safeway Trails, Inc.*, 140 F.2d at 890 (citation omitted).[16] The defendants are not subject to inconsistent obligations:

> The possibility that [defendant] may bear the whole loss if it is found liable is not the equivalent of double liability. It is instead a common result of joint and several liability and should not be equated with prejudice. Inherent in the concept of joint and several liability is the right of a plaintiff to satisfy its whole judgment by execution against any one of the multiple defendants who are liable to him, thereby forcing the debtor who has paid the whole debt to protect itself by an action for contribution against the other joint obligors.

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d at 412.

Defendants have also asserted that Pullman LLC could be prejudiced by its absence from the case. In defendants' view, "a probable defense" of the named defendants was that Pullman LLC was the "the actual entity responsible for the acts complained of." (Dkt. No. 25: Defs. Br. at 14–15; *see also* Dkt. No. 27: Defs. Reply Br. at 13.) According to defendants, if the named defendants escaped judgment for breach of contract by pinning blame on Pullman LLC, Pullman LLC "would risk being bound by the judgment under the doctrine of issue preclusion . . . ." (Defs. Br. at 15.)

Defendants' argument entirely relies on Pullman LLC being the sole obligor under the Engagement Letter. As a *joint* obligor, however, Pullman LLC could ameliorate any prejudice by simply intervening or being impleaded by defendants—possibilities that defendants acknowledge (Defs. Reply Br. at 12–13) but have not taken advantage of.[17] *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d at 412–13 (absent co-obligor held not necessary party under Rule 19(a)(2)(ii) because named defendant was "free to implead [the absent co-obligor], using Rule 14, . . . or to institute a separate action against [absent party] for contribution or indemnity upon principles of restitution if it is ultimately held liable" to plaintiff.); *Niroomand v. Erie County Med. Ctr.*, No. 94–CV–0021, 1996 WL 328183 at *7 (W.D.N.Y. June 4, 1996) ("The defendants have not claimed that joinder of [absent party] by means of a third-party complaint is not feasible. Furthermore, there is no showing that any defendant . . . is barred from bringing a subsequent claim for indemnity or contribution in another action; therefore there is apparent to this Court no prejudice to any party caused by the absence of [absent party] in this action that will result from proceeding without it.").

In addition, even if defendants could establish that this action would have a preclusive effect on Pullman LLC, "the court looks to the adequacy with which a party to the suit

---

**16.** In contrast, where the absent party is a joint obligee rather than a joint obligor, the courts will dismiss on indispensability grounds, because the absent party could bring a separate action, subjecting the obligors "to double liability on the same claim." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d at 408; *accord e.g., Rose v. Simms*, 1995 WL 702307 at *5–6 (co-obligors, unlike co-obligees, are not indispensable parties); 7 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 3d* § 1613 at 181 (In contrast to joint obligors, "[j]oint obligees . . . usually have been held indispensable parties and their nonjoinder has led to a dismissal of the action."); 4 *Moore's Federal Practice* § 19.06[3] (same). Thus, defendants' citation to cases involving joint obligees (Defs. Br. at 8–12) is unavailing, as those cases are distinguishable.

Defendants also cite a variety of other distinguishable decisions. (Defs. Br. at 9–15.) For example, cases involving requests for injunctive relief or to set aside a contract have been held to require the presence of all parties to the contract, because such actions could otherwise result in inconsistent obligations. This case, however, involves neither a claim for injunctive relief nor a claim for rescision of the contract.

Defendants also cite decisions (Defs. Reply Br. at 10–12) holding that where an assignment has been effectuated, the assignor is not the proper party to assert the assigned claim, as the assignee is the real party in interest. Here, by contrast, the assignee is an obligor (defendant) rather than an obligee (plaintiff).

**17.** As a practical matter, there is little danger that Pullman LLC's absence will have any effect. First, if plaintiffs lose on the merits, there is no question that they will be precluded from raising the same claims and issues against Pullman LLC in state court. Second, if plaintiffs win, their injury will be probably be entirely compensated by the present defendants, and thus will have no grounds to sue Pullman LLC. *See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d at 406 n. 7.

represents the absent party's interests." *Rose v. Simms*, 95 Civ. 1466, 1995 WL 702307 at *6 (S.D.N.Y. Nov.29, 1995). David Pullman is founder, Chairman, CEO, President and 99% owner of Pullman LLC. (Dkt. No. 46: Pullman 12/12/02 Aff. ¶¶ 1–3.) David Pullman is therefore, "as a practical matter," Rule 19(a)(2)(i), more than capable of representing Pullman LLC's interests in this litigation. *See, e.g., BMG Music v. Vanxy, Inc.*, 98 Civ. 6496, 1999 WL 493345 at *2 (S.D.N.Y. July 12, 1999) (absent corporation was not necessary, much less indispensable party: "Diaz, as Padosa's president and sole shareholder, would certainly be able to adequately represent Padosa, especially given that Diaz would provide Padosa's representation and that the interests of Diaz and Padosa are identical."); *Rose v. Simms*, 1995 WL 702307 at *6 ("As President and sole shareholder of Round Hill, Simms and Round Hill share an identity of interest. Simms ultimately bears any loss suffered by Round Hill. Thus, even if an adverse ruling against Simms were to preclude Round Hill from asserting its rights in some way, Simms more than adequately represents Round Hill's interests in the current litigation.").[18]

Accordingly, even if it is assumed, *arguendo,* that Pullman LLC is a necessary party under Rule 19(a), it is not indispensable under Rule 19(b). Plaintiffs can obtain complete relief in this action, because the defendants' liability is joint and several. The named defendants can avoid sole responsibility for the contract breach by impleading or independently suing Pullman LLC. There is no danger that defendants will be subject to inconsistent obligations, because plaintiffs have requested only money damages. And while Pullman LLC may be subject to issue preclusion, its interests are more than adequately represented in the litigation by Pullman.

Further, all of the acts relevant to the alleged breach of contract in this case were committed by Fahnestock or The Pullman Group. (*E.g.,* Defs. 56.1 Stmt. ¶¶ 17, 27; Defs. Br. at 5–6.) Fahnestock is a named defendant, and The Pullman Group is directly represented by its sole proprietor, Pullman, also a named defendant. Pullman LLC was formed *after* the contract at issue had already been fully performed. Thus, the Court's interest in a full airing of the relevant facts will be satisfied. And although the state court would be an adequate alternative venue, that single factor is not dispositive. *See, e.g., Samaha v. Presbyterian Hosp.,* 757 F.2d 529, 531 (2d Cir.1985) ("this court has recognized that … the bare fact that a state court forum is available does not, by itself, make it appropriate to dismiss the federal action."); *Prescription Plan Serv. Corp. v. Franco,* 552 F.2d 493, 497 (2d Cir.1977) ("[I]t seems inappropriate to dismiss the action simply because there exists a state forum …. The interests of the two groups are identical, counsel for those remaining in the case will be no less vigorous in their advocacy ….").

In "equity and good conscience," the Court finds that Pullman LLC is not indispensable to this action under Rule 19(b).

### CONCLUSION

Because Pullman LLC is no more than a co-obligor under the Engagement Letter and a joint tortfeasor with defendant Fahnestock and Pullman, and because defendant Pullman adequately represents Pullman LLC's interests in this litigation, Pullman LLC is not an indispensable party to this action under Rule 19(b). Defendants' motion to dismiss pursuant to Rule 12(b)(7) should be denied. If defendants wish to implead Pullman LLC, they must do so by August 16, 2002.

---

**18.** *See also, e.g., Southeastern Sheet Metal Joint Apprenticeship Training Fund v. Barsuli,* 950 F.Supp. 1406, 1414 (E.D.Wis.1997) (" 'Impairment may be minimized if the absent party is adequately represented in the suit,' *i.e.,* if there is another party in the suit with virtually identical interests who would be advancing virtually the same legal and factual positions.") (citation omitted); *Aetna Cas. & Sur. Co. v. Namrod Dev. Corp.,* 140 B.R. 56, 61–62 (S.D.N.Y.1992) (absent corporate defendant not necessary because it was "adequately represented" by named defendants who were the absent party's "controlling shareholders, its President and Vice–President respectively and at least as of 1982, constituted its board of directors and owned all its stock"); *National Union Fire Ins. Co. v. Mason, Perrin & Kanovsky,* 709 F.Supp. 411, 414 (S.D.N.Y.1989) (if present defendants will raise all arguments that absent parties would raise, absent parties' interests are adequately represented.).

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard M. Berman, 40 Centre Street, Room 201, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Berman. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72, 6(a), 6(e).

Dated: Aug. 1, 2002.